# COVER SHEET
## Civil Case Filing Form
*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court Form AOC/01
Administrative Office of Courts (Rev 2020)

Court Identification Docket #: 30 (County #) | Judicial District | CO (Court ID (CH, CI, CO))

Case Year: 2026

Docket Number: 22151

Local Docket ID

10 06 26 (Month Date Year)

This area to be completed by clerk

Case Number if filed prior to 1/1/94

In the County Court of Jackson County — 19th Judicial District

**Origin of Suit (Place an "X" in one box only)**

- [X] Initial Filing
- [ ] Remanded
- [ ] Reinstated
- [ ] Reopened
- [ ] Foreign Judgment Enrolled
- [ ] Joining Suit/Action
- [ ] Transfer from Other court
- [ ] Appeal
- [ ] Other

**Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form**

**Individual**: Hudson (Last Name) Benjamin (First Name) ______ (Maiden Name, if applicable) W. (M.I.) Jr. (Jr/Sr/III/IV)

___ Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ______

___ Check ( x ) if Individual Planitiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency ______

**Business** ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check ( x ) if Business Planitiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A ______

**Address of Plaintiff** ______

**Attorney (Name & Address)** J. Tyler Cox, 1113 Jackson Ave. Pascagoula, MS **MS Bar No.** 105807

___ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney

Signature of Individual Filing: [signature]

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

**Individual**: Hughes (Last Name) Damarcus (First Name) ______ (Maiden Name, if applicable) ______ (M.I.) ______ (Jr/Sr/III/IV)

___ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ______

___ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency ______

**Business** ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A ______

**Attorney (Name & Address) - If Known** ______ **MS Bar No.** ______

___ **Check ( x ) if child support is contemplated as an issue in this suit.***
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

**Domestic Relations**
- [ ] Child Custody/Visitation
- [ ] Child Support
- [ ] Contempt
- [ ] Divorce:Fault
- [ ] Divorce: Irreconcilable Diff.
- [ ] Domestic Abuse
- [ ] Emancipation
- [ ] Modification
- [ ] Paternity
- [ ] Property Division
- [ ] Separate Maintenance
- [ ] Term. of Parental Rights-Chancery
- [ ] UIFSA (eff 7/1/97; formerly URESA)
- [ ] Other ______

**Appeals**
- [ ] Administrative Agency
- [ ] County Court
- [ ] Hardship Petition (Driver License)
- [ ] Justice Court
- [ ] MS Dept Employment Security
- [ ] Municipal Court
- [ ] Other ______

**Business/Commercial**
- [ ] Accounting (Business)
- [ ] Business Dissolution
- [ ] Debt Collection
- [ ] Employment
- [ ] Foreign Judgment
- [ ] Garnishment
- [ ] Replevin
- [ ] Other ______

**Probate**
- [ ] Accounting (Probate)
- [ ] Birth Certificate Correction
- [ ] Mental Health Commitment
- [ ] Conservatorship
- [ ] Guardianship
- [ ] Joint Conservatorship & Guardianship
- [ ] Heirship
- [ ] Intestate Estate
- [ ] Minor's Settlement
- [ ] Muniment of Title
- [ ] Name Change
- [ ] Testate Estate
- [ ] Will Contest
- [ ] Alcohol/Drug Commitment (Involuntary)

- [ ] Alcohol/Drug Commitment (Voluntary)
- [ ] Other

**Children/Minors - Non-Domestic**
- [ ] Adoption - Contested
- [ ] Adoption - Uncontested
- [ ] Consent to Abortion
- [ ] Minor Removal of Minority
- [ ] Other ______

**Civil Rights**
- [ ] Elections
- [ ] Expungement
- [ ] Habeas Corpus
- [ ] Post Conviction Relief/Prisoner
- [ ] Other ______

**Contract**
- [ ] Breach of Contract
- [ ] Installment Contract
- [ ] Insurance
- [ ] Specific Performance
- [ ] Other ______

**Statutes/Rules**
- [ ] Bond Validation
- [ ] Civil Forfeiture
- [ ] Declaratory Judgment
- [X] Injunction or Restraining Order
- [ ] Other ______

**Real Property**
- [ ] Adverse Possession
- [ ] Ejectment
- [ ] Eminent Domain
- [ ] Eviction
- [ ] Judicial Foreclosure
- [ ] Lien Assertion
- [ ] Partition
- [ ] Tax Sale: Confirm/Cancel
- [ ] Title Boundary or Easement
- [ ] Other ______

**Torts**
- [ ] Bad Faith
- [ ] Fraud
- [ ] Intentional Tort
- [ ] Loss of Consortium
- [ ] Malpractice - Legal
- [ ] Malpractice - Medical
- [ ] Mass Tort
- [ ] Negligence - General
- [ ] Negligence - Motor Vehicle
- [ ] Premises Liability
- [ ] Product Liability
- [ ] Subrogation
- [ ] Wrongful Death
- [ ] Other ______

IN THE County COURT OF Jackson COUNTY, MISSISSIPPI
19th JUDICIAL DISTRICT, CITY OF Pascagoula

Docket No. ______ - ______ ______
File Yr Chronological No. Clerk's Local ID

Docket No. If Filed
Prior to 1/1/94 ______

**PLAINTIFFS IN REFERENCED CAUSE - Page __ of __ Plaintiffs Pages**
**IN ADDITION TO PLAINTIFF SHOWN ON CIVIL CASE FILING FORM COVER SHEET**

**Plaintiff # 2:**

**Individual:** Pitalo (Last Name) Eli (First Name) (______ Maiden Name, if Applicable) J. (Middle Init.) ______ (Jr/Sr/III/IV)

___Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of ______

___Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A ______

**Business** ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the name above, and enter below:

D/B/A ______

ATTORNEY FOR THIS PLAINTIFF: 105807 Bar # or Name: J. Tyler Cox *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**Plaintiff # 3:**

**Individual:** Seymour (Last Name) Morgan (First Name) (______ Maiden Name, if Applicable) ______ (Middle Init.) ______ (Jr/Sr/III/IV)

___Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of ______

___Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A ______

**Business** ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the name above, and enter below:

D/B/A ______

ATTORNEY FOR THIS PLAINTIFF: 105807 Bar # or Name: J. Tyler Cox *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**Plaintiff # ___:**

**Individual:** ______ (Last Name) ______ (First Name) (______ Maiden Name, if Applicable) ______ (Middle Init.) ______ (Jr/Sr/III/IV)

___Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of ______

___Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A ______

**Business** ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the name above, and enter below:

D/B/A ______

ATTORNEY FOR THIS PLAINTIFF: ______ Bar # or Name: ______ *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**COUNTY - CIVIL** HANDED ☐ MAILED ☐

**No. 78018** Date 10/7 20 26

Received Of Taylor & COV

Cause No. 26-22,151

| | |
|---|---|
| For: Clerk's Fees | $85.00 |
| JSO Fund | $40.00 |
| Steno Tax | $10.00 |
| Jury Tax | $3.00 |
| Law Library | $2.50 |
| SCEF | $2.00 |
| Court Adm. Fund | $2.00 |
| CECSF | $10.00 |
| CLAF | $5.00 |
| SCCF | $0.50 |
| RM FEE | $1.00 |
| Copy of Summons Return | |
| Other Advance Cost | |
| TOTAL | $ 161 |

Total Amount Paid $ 161.00 Check No. 1723

For Complaint

**RANDY CARNEY**
CIRCUIT CLERK OF JACKSON COUNTY

By Dana O'Regan
DEPUTY CIRCUIT CLERK

**IN THE COUNTY COURT OF JACKSON COUNTY, MISSISSIPPI**

**BENJAMIN WARREN HUDSON, JR.**, a minor,
by and through his parent and next friend,
DR. BENJAMIN HUDSON

**ELI JAX PITALO**, a minor,
by and through his parent and next friend,
GEORGE "TRAE" PITALO, III

and
**MORGAN SEYMOUR**, a minor,
by and through his parent and next friend,
MICHAEL SEYMOUR

FILED
OCT 06 2026
RANDY CARNEY, CLERK
BY________________D.C.

**PLAINTIFFS**

VERSUS CAUSE NO.: CO-2026-22,151

**DAMARCUS HUGHES a/k/a "BOOGIE LOWDOWN"** **DEFENDANT**

---

**COMPLAINT FOR DAMAGES,**
**PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**
**(JURY TRIAL DEMANDED)**

---

COME NOW the Plaintiffs, Benjamin Warren Hudson, Jr., a minor, by and through his parent and next friend, Dr. Benjamin Hudson; Eli Jax Pitalo, a minor, by and through his parent and next friend, George "Trae" Pitalo, III; and Morgan Seymour, a minor, by and through his parent and next friend, Michael Seymour, by and through their counsel, J. Tyler Cox of *Taylor and Cox Law Firm*, and file this their Complaint against the Defendant, Damarcus Hughes, and would show the following, to-wit:

**INTRODUCTION**

1. Plaintiffs Benjamin Warren Hudson, Jr. (hereinafter "Warren"), Eli Jax Pitalo (hereinafter "Jax"), and Morgan Seymour (hereinafter "Morgan") bring this action to redress the injury and damage resulting from the false and defamatory statements, accusations, and insinuations of and concerning them that Defendant Damarcus Hughes (hereinafter "Hughes") has published, and continues to publish, on Facebook under the names "Boogie LowDown" and "Boogie THEE LowDown," and to stop Hughes

**IN THE COUNTY COURT OF JACKSON COUNTY, MISSISSIPPI**

**BENJAMIN WARREN HUDSON, JR.**, a minor,
by and through his parent and next friend,
DR. BENJAMIN HUDSON

**ELI JAX PITALO**, a minor,
by and through his parent and next friend,
GEORGE "TRAE" PITALO, III

and
**MORGAN SEYMOUR**, a minor,
by and through his parent and next friend,
MICHAEL SEYMOUR

**PLAINTIFFS**

VERSUS CAUSE NO.: ______________

**DAMARCUS HUGHES a/k/a "BOOGIE LOWDOWN"** **DEFENDANT**

---

**COMPLAINT FOR DAMAGES,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION
(JURY TRIAL DEMANDED)**

---

COMES NOW the Plaintiffs, Benjamin Warren Hudson, Jr., a minor, by and through his parent and next friend, Dr. Benjamin Hudson; Eli Jax Pitalo, a minor, by and through his parent and next friend, George "Trae" Pitalo, III; and Morgan Seymour, a minor, by and through his parent and next friend, Michael Seymour, by and through their counsel, J. Tyler Cox of *Taylor and Cox Law Firm*, and file this their Complaint against the Defendant, Damarcus Hughes, and would show the following, to-wit:

**INTRODUCTION**

1. Plaintiffs Benjamin Warren Hudson, Jr. (hereinafter "Warren"), Eli Jax Pitalo (hereinafter "Jax"), and Morgan Seymour (hereinafter "Morgan") bring this action to redress the injury and damage resulting from the false and defamatory statements, accusations, and insinuations of and concerning them that Defendant Damarcus Hughes (hereinafter "Hughes") has published, and continues to publish, on Facebook under the names "Boogie LowDown" and "Boogie THEE LowDown," and to stop Hughes from

continuing to brand them as killers before his audience. Hughes calls himself "LowDown." It is the one thing he has published about this case that is true.

2. On or about September 6, 2026, Hughes called Warren, Jax, and Morgan "those white murderers" in a public post to his Facebook audience. That accusation is false. It charges three young men with the gravest of crimes, and it is actionable as Defamation *Per Se*.

3. The post was not an isolated remark. Before and after it, Hughes told his audience that Nolan Xavier Wells ("Nolan") died aboard Plaintiffs' boat while a rescue call was being placed; that Plaintiffs kept his body there, carried his phone and keys into Jax's home, and invented an alibi; and, after the Jackson County Grand Jury returned a No True Bill, that they are "white friends who may be his murderers." The gist of Hughes's publications is that Plaintiffs killed Nolan and covered it up. That gist is false and defamatory and is actionable *per se*, as are the specific statements described below.

4. Warren, Jax, and Morgan did not kill Nolan, did not harm him, had nothing to do with causing his death, and have no knowledge of any action taken to hurt Nolan. Nolan was their close friend.

5. After a death investigation in which 132 subpoenas were issued and 43 witnesses testified, the Jackson County Grand Jury unanimously returned a No True Bill and found that the allegations against the occupants of the boats on which Plaintiffs traveled "are not based in truth and are solely the result of public clamor and private malice." The Grand Jury's report was publicly released on September 21, 2026.

6. Hughes read the report and did not stop. The day after it was released, he told his audience, "if YOU THOUGHT, that this Grand Jury report about #NolanWells was going to make me SHUT TF UP or MOVE ON, then you have LOST YOUR DAMN MIND!" He then published a series of posts stating that Nolan did not drown, that Plaintiffs "KNOW something," and that they "may be his murderers."

7. Hughes's statements, accusations, and insinuations are not based on truthful facts or credible evidence and are not privileged. They were published negligently and with knowledge of, or reckless disregard for, their falsity. Attaching the word "allegedly" to an accusation of murder does not make it something other than an accusation of murder.

8. Hughes was told that his statements were false. By his own account, Warren's mother wrote to him on July 5, 2026, told him "[y]our information is not correct," and asked him to stop posting about Warren and his family. Hughes instead published her private message to his audience. When a follower later warned him that "they watching your page," he answered, "And you KNOW, that I DON'T GIVE A DAMN!"

9. Plaintiffs ask this Court to stop Hughes's campaign against them now, before it does further damage. They seek damages within this Court's jurisdictional limit; a preliminary injunction barring Hughes from posting, commenting, and hosting or joining LIVE broadcasts until a trial on the merits; and, in the alternative and in any event, injunctive relief directed to the disclosure of their nonpublic locating information, the public identification of the minor Plaintiffs, direct contact with them, the solicitation of others to confront them, the preservation of evidence, and the specific statements finally adjudicated to be false and defamatory.

**PARTIES**

10. Warren is over the age of eighteen but under the age of twenty-one (21) and is therefore a minor under Mississippi law. He resides in Jackson County, Mississippi. He brings this action by and through his father and next friend, Dr. Benjamin Hudson, an adult resident citizen of Jackson County, Mississippi.

11. Jax is over the age of eighteen but under the age of twenty-one (21) and is therefore a minor under Mississippi law. He resides in Jackson County, Mississippi. He brings this action by and through his father and next friend, George "Trae" Pitalo, III, an adult resident citizen of Jackson County, Mississippi.

12. Morgan is over the age of eighteen but under the age of twenty-one (21) and is therefore a minor under Mississippi law. He resides in Jackson County, Mississippi. He brings this action by and through his father and next friend, Michael Seymour, an adult resident citizen of Jackson County, Mississippi.

13. The foregoing allegations concerning Plaintiffs' minority and next-friend representation are made pursuant to Miss. Code Ann. § 1-3-27 and Mississippi Rule of Civil Procedure 17(c).

14. Each Plaintiff is a private citizen and has never attained the status of a public official, public figure, or vortex public figure for purposes of filing and prosecuting a defamation action. None sought public attention or voluntarily injected himself into any public controversy. After public accusations concerning Nolan's death were leveled against them, Plaintiffs gave interviews denying involvement. Those responses were made solely to defend against accusations made by others.

15. Hughes is an adult resident citizen of Jackson County, Mississippi, who, upon information and belief, resides at and owns the real property located at 1906 Dolphin Drive, Gautier, Mississippi 39553 and who can receive mail at 1800 Highway 90, Unit 1644, Gautier, Mississippi 39553. Upon information and belief, Hughes operates the publicly available Facebook profile "Boogie LowDown," located at facebook.com/marcust.hughes.7, and the publicly available Facebook page "Boogie THEE LowDown." Hughes is not new to this. Upon information and belief, he has for years used his platform, and the audience of some twenty thousand followers he has built through them, to traffic in rumor and gossip about the people of the Mississippi Gulf Coast and to malign private individuals who have no practical means of answering him; the "Boogie LowDown" profile alone dates to May 2019 and has published more than fifty-nine thousand posts. Plaintiffs are simply the latest, and the youngest, of his targets. The conduct of this Defendant, which is the subject of this litigation occurred within the State of Mississippi, and he is a resident of Jackson County, Mississippi. Hughes may be served with process in any manner authorized by Mississippi Rule of Civil Procedure 4.

## JURISDICTION AND VENUE

16. This Court has proper in personam and subject matter jurisdiction. Pursuant to Miss. Code Ann. § 9-9-21, Plaintiffs limit the amount or value in controversy, including the aggregate compensatory and punitive damages sought and the value of any equitable relief, to an amount not exceeding $200,000.00, exclusive of costs and interest.

17. Hughes is subject to the jurisdiction of this Court because he is a resident of Jackson County, Mississippi, and because he committed the torts described herein in the State of Mississippi against residents of this State.

18. Hughes focused his publications on Plaintiffs and expressly aimed his false and defamatory accusations and insinuations at them, knowing they are residents of Jackson County, Mississippi. His publications concern a death that occurred in Jackson County and an investigation conducted by a Jackson County grand jury. He names Plaintiffs and their families, tags his posts as made "at Horn Island" and in "Ocean Springs," and has displayed the telephone number of the Jackson County Sheriff's Department and urged his audience to call it.

19. Hughes's publications were and continue to be published and accessible to viewers in Jackson County, Mississippi. It was the natural and foreseeable result of those publications that Hughes's false and defamatory accusations and insinuations would be published and republished in Jackson County, Mississippi, causing harm, injury, and damage to Plaintiffs in Jackson County, Mississippi, where they reside.

20. Venue is proper in this Court pursuant to Miss. Code Ann. § 11-11-3 because Hughes resides in Jackson County, Mississippi, and because substantial acts or omissions or substantial events causing Plaintiffs' injuries and damages occurred in Jackson County, Mississippi.

## FACTUAL BACKGROUND

### A. Warren, Jax, Morgan, and Nolan

21. Nolan was Plaintiffs' close friend. Warren, Jax, and Morgan loved Nolan like a brother.

22. On July 4, 2026, Plaintiffs traveled to Horn Island, a barrier island in Jackson County, Mississippi, as part of a group of approximately thirty friends aboard three boats: the Triton, the Palm Beach, and the Tideline. Nolan traveled to Horn Island aboard the Triton.

23. At approximately 4:28 p.m., the three boats departed Horn Island. Nolan, by his own choice, remained on the island to socialize with other people who were also there. Nolan was alive and well when Plaintiffs left.

24. On the return trip, the Triton was taking on water because of a bilge pump malfunction. At approximately 4:48 p.m., a member of the group called Sea Tow. The Tideline towed the Triton, and the three boats reached the mainland at approximately 6:01 p.m. Nolan was not aboard any of them.

25. That night, when no one in the group had heard from Nolan, Warren telephoned Nolan's mother at approximately 11:07 p.m. and the United States Coast Guard at approximately 11:13 p.m. to report that Nolan had not returned. Warren also spoke with the Jackson County Sheriff's Department.

26. Nolan's phone had remained with the group on the return trip. In the early morning hours of July 5, 2026, it was handed over, without delay, to persons who came asking for it. No Plaintiff touched, possessed, accessed, altered, or erased data from Nolan's phone. Nolan's keys, which he had left in Jax's bedroom, were turned over to Nolan's stepfather.

27. On the morning of July 5, 2026, Warren and Jax returned to Horn Island by boat to search for their friend.

28. No Plaintiff has any knowledge of what happened to Nolan after Plaintiffs left Horn Island, and no Plaintiff had any involvement in his disappearance or death.

**B. The Grand Jury Investigation and No True Bill**

29. The Jackson County Grand Jury investigated Nolan's death. It issued 132 subpoenas, heard from 43 witnesses, and had full and open access to the complete Jackson County Sheriff's Office investigative file, including materials from assisting agencies. The materials it considered included the Wells family's preliminary and final forensic cellphone reports and a 261-page Snapchat Conversation Report. A true and correct copy of the Grand Jury's report is attached as Exhibit A.

30. The Grand Jury unanimously returned a No True Bill with respect to the death investigation of Nolan Xavier Wells. Its report was filed on September 18, 2026. On September 21, 2026, the Jackson County District Attorney publicly announced the decision and released the report, which was widely reported.

31. The Grand Jury made the following findings concerning the public allegations against the people who rode to and from Horn Island, Ex. A at 5:

> The Grand Jury finds no credible evidence to support the public allegations that any persons who rode to or from Horn Island on July 4, 2026, on the Triton, the Palm Beach, or the Tideline engaged in any criminal conduct related to the death of Mr. Wells. The allegations against the occupants of the Triton, the Palm Beach, and the Tideline are not based in truth, and are solely the result of public clamor and private malice. Further, the public clamor and malicious allegations against the occupants of the Triton, the Palm Beach, and the Tideline have extended to their family members and friends. The Grand Jury finds that the public attacks on the occupants of the Triton, the Palm Beach, and the Tideline, as well as their family and friends, are malicious, false, and have no truth in fact or evidence.

32. Each Plaintiff rode to or from Horn Island on July 4, 2026, aboard the Triton, the Palm Beach, or the Tideline, and is therefore among the persons as to whom the Grand Jury found no credible evidence of any criminal conduct related to Nolan's death.

33. The Grand Jury also found that Nolan chose to remain on Horn Island after the three boats departed; that "Mr. Wells' phone was not the only phone to travel back to the mainland without its owner"; that Nolan "was not in any physical altercation or argument on July 4, 2026"; that "GPS data and security footage confirm the accounts of the passengers on the Triton, Palm Beach, and Tideline"; that those passengers "cooperated fully with this investigation"; and that the Sea Tow calls and interpretations circulating on the internet and social media "are not true and accurate." Ex. A at 5-6.

34. Plaintiffs do not allege that the No True Bill conclusively established the cause of Nolan's death. They allege that the Grand Jury, after examining the available evidence, found no credible evidence that Plaintiffs engaged in any criminal conduct related to Nolan's death, and that the public allegations against them are false.

**C. Hughes's Facebook Accounts**

35. Hughes publishes on Facebook under two names. The profile "Boogie LowDown" had, upon information and belief, approximately 20,000 followers during the period at issue. The page "Boogie THEE LowDown" describes itself as delivering "Opinions and Perspectives on local, national, and international events" and had approximately 13,000 followers as of October 5, 2026. According to Facebook's own page-transparency information, the "Boogie THEE LowDown" page was not created until July 2026, the month Nolan died. Hughes built that page around Nolan's death from the start: its profile

and cover photographs are photographs of Nolan, and its 351 posts, which drew its 13,000 followers in roughly three months, are devoted almost entirely to Nolan's death and to Plaintiffs. The "Boogie LowDown" profile, by contrast, has existed since May 2019 and describes Hughes as a "Digital creator" and "Musician." Hughes treats the two as one. On the page he refers to "the Boogie LowDown page" as his own, signs posts "Boogie LowDown," and marks images with the legend "FB: Boogie LowDown." Whatever the name was meant to convey when Hughes chose it, the conduct described below has made it apt.

36. Hughes has made Nolan's death a principal subject of both accounts. Between July 2026 and October 2026, he published dozens of posts about Nolan's death and about Plaintiffs, most under the hashtag "#JusticeForNolanWells." Images of the posts described below, as captured from Facebook and showing the date and reaction, comment, and share counts of each, are attached collectively as Exhibit B.

37. Hughes's posts reach a large audience. His two-part republication of an interview of Warren drew approximately 12,000 and 7,300 reactions, 4,500 and 2,200 comments, and 1,700 and 1,000 shares. Hughes holds himself out as a source of news on Nolan's death, referring to "my other content creators, independent media friends," and telling his audience, "I am not under a damn gag order." Ex. B-3, B-4, B-5.

38. Hughes identifies Plaintiffs to his audience. He names "Warren Hudson," "Jax Pitalo," and "Morgan Seymour," refers to them as the "best friends," in quotation marks, and as "the Horn Island 5," and publishes their photographs. Hughes's audience understood his statements to be of and concerning Plaintiffs.

**D. Hughes Calls Plaintiffs "Those White Murderers"**

39. On or about September 6, 2026, Hughes published on the "Boogie LowDown" profile a post that began (Ex. B-1):

> Hughes: Do y'all see how quickly those white murderers #allegedly DISASSOCIATED themselves from Officer Tatum???

40. The "white murderers" of this post are Warren, Jax, and Morgan. They are the only persons connected with the events of July 4, 2026, who appeared on the program of the commentator known as Officer Tatum. Hughes knew that, and so did his audience, because Hughes had himself republished those interviews on July 22 and 23, August 11, and August 12, 2026, identifying Warren, Jax, and Morgan by name. Ex. B-4, B-5, B-10, B-11, B-12. No reader of the post could have understood "those white murderers" to mean anyone else.

41. The statement is one of fact. It says that Plaintiffs murdered Nolan. The hashtag "#allegedly" placed after the accusation does not withdraw it, and the posts described below show that Hughes meant it literally: he told his audience how, where, and in whose presence, he claimed Nolan died. The gist of this statement is that Plaintiffs murdered Nolan. The gist of this statement and the statement itself are false and defamatory and portray Plaintiffs in a false light. Nor is the September 6 post an isolated use of the device. Hughes appends "#allegedly" to his statements as a matter of habit, even to the premise of an entire timeline: "It is Monday, August 10th, and #allegedly, this is what we know." Ex. B-9. Hughes uses the hashtag as a talisman, not a qualification. He believes it will protect him from the consequences of what he publishes, which is why, when a follower warned him that "they watching your page," he answered that he did not "GIVE A DAMN." When Hughes writes "#allegedly," he is not reporting an accusation someone else has made; there is no one else. He is the accuser, and the word is his admission that he has nothing to back the accusation up. A man who knows he is telling the truth does not need a talisman, but Hughes reaches for one every time because he knows he is not. Calling three minors murderers and appending a hashtag does not turn the accusation into a question, and the law does not let a speaker buy immunity for a word. Hughes's "#allegedly" is not a defense to this action. It is proof of the knowledge and reckless disregard that sustain it.

42. Hughes published the post to the public. Within an hour it had drawn dozens of reactions and comments from his followers, who joined in. One follower wrote beneath it, "Now cousin Boogie LowDown you know they watching your page." Hughes replied, "And you KNOW, that I DON'T GIVE A DAMN!" Ex. B-2.

43. This accusation is the center of this action. Hughes did not ask a question, report what others were saying, or offer a theory. He called three named young men murderers before an audience of thousands in the county where they live.

**E. Hughes's Other Publications Show that He Meant the Accusation as Fact**

44. The "white murderers" post did not stand alone. Before and after it, Hughes published the statements described in this Section. They are independently false and defamatory, and they show that when Hughes called Plaintiffs murderers he was not joking or exaggerating. He was summarizing what he had been telling his audience for weeks, and what he went on telling them after the Grand Jury found otherwise.

**1. Hughes Falsely States that Nolan Was Dying Aboard the Boat During the Sea Tow Call**

45. On July 26, 2026, Hughes published a post headed "Some shiit, AIN'T ADDING UP!" in which he told his audience what the "background audio" of the Sea Tow call "reportedly captures" (Ex. B-6):

> Hughes: "Nono, wake up / "Wyatt, check his chest" / "Is he dead?" / "Nolan, wake up!!!" / If Nolan was not on the boat, why are people saying his name?

46. In the same post, under the heading "WHO WAS PROBABLY ON THE BOAT?", Hughes listed "Eli Jax Pitalo," "Warren Hudson," and "Morgan Seymour," listed "Nolan Wells | Victim," and wrote, "The friends lawyered up and went silent," and, "The evidence is clear." Ex. B-6.

47. The gist of these statements is that Nolan was aboard the boat, unconscious and dying, in the presence of Plaintiffs while the Sea Tow call was made, and that Plaintiffs concealed it. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. Nolan was not aboard any of the three boats. No such words were spoken. The Grand Jury found that the Sea Tow calls and interpretations circulating on the internet and social media "are not true and accurate." Ex. A at 5-6.

**2. Hughes Falsely States that Plaintiffs Returned from Horn Island with Nolan Dead**

48. On August 10, 2026, Hughes published a post listing the persons who "DEPARTED for Horn Island on July 4th," each followed by "(Living Status – ALIVE)," and then the persons who "RETURNED from Horn Island on July 4th," in which Warren, Jax, and Morgan are again listed as "ALIVE" and Nolan is listed as "(Living Status – DEAD)." He wrote, "Why did everyone else RETURN, except HIM??? Why is everyone else ALIVE, except HIM???" Ex. B-9.

49. On August 12, 2026, Hughes published photographs of Plaintiffs with Nolan under the words, "Everyone, in these images of 'best friends', is ALIVE, except ONE! Can you guess who it is???" Ex. B-13.

50. The gist of these statements is that Nolan was dead when Plaintiffs returned from Horn Island and that Plaintiffs are responsible for his death. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. Nolan was alive and well when the three boats left Horn Island.

**3. Hughes Falsely States that Plaintiffs Kept Nolan's Body on the Boat and Invented an Alibi**

51. On August 14, 2026, Hughes published a post in which he said (Ex. B-14):

> Hughes: I do NOT believe Nolan stayed on the island, with some "girl". I believe that story was MADE TF UP, to COVER THEIR TRACKS, and to create an alibi. The more I listen to the REAL audio, of that SEA TOW CALL, the more I believe that Nolan, was on that.boat, DYING, and eventually, DIED! . . . I believe the reason that Nolan's phone and keys, were at Jax Pitalo's house, is because Nolan ON THAT BOAT, WITH HIS PHONE AND KEYS, when he passed away! I believe his phone and keys were taken OFF the boat and brought INTO that home, while his body REMAINED on that boat, until they could figure out what to do with him, in my opinion.

52. The same day, Hughes published a second post stating that Nolan's car, keys, and cellphone were "at JAX PITALO'S HOUSE!!!" and that Jax had said Nolan "'was' like a brother to me," and asking, "What do you mean, 'WAS'? Hell, at this point in the timeline, Nolan was not even deemed MISSING OR

DECEASED." On August 16, 2026, he wrote, "I honestly feel like Nolan, GOT ON THAT BOAT!!!" Ex. B-15, B-16.

53. The gist of these statements is that Nolan died aboard the boat with Plaintiffs, that Plaintiffs kept his body there while they decided how to dispose of it, that they carried his phone and keys into Jax's home, that Jax knew Nolan was dead before he was reported missing, and that Plaintiffs fabricated their account as an alibi. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. The words "I believe" and "in my opinion" do not change what Hughes told his audience had happened.

**4. Hughes Continues After the Grand Jury's Report**

54. Hughes knew of the Grand Jury's findings. On the night of September 21, 2026, the day the report was released, he published an image of its cover and wrote, "I am so ANGRY and UPSET about what the Grand Jury released about the #NolanWells case, that I can SCREAM! . . . Evil and Rich white people, have been getting away with MURDER, for DECADES, in the State of Mississippi – and they all work TOGETHER, to achieve it!" Ex. B-19.

55. The next morning, September 22, 2026, Hughes published the following (Ex. B-20):

> Hughes: And if YOU THOUGHT, that this Grand Jury report about #NolanWells was going to make me SHUT TF UP or MOVE ON, then you have LOST YOUR DAMN MIND! . . . Y'all (and you know who I am talking about) are some evil and hate-filled, Bible-toting, cokang snorting, orgy-having bastards, who LOVE MURDER, and you ALWAYS will be, and we SEE YOU.

56. Hughes then continued. After the report was released, he published the posts described below.

**5. Hughes Falsely States that Nolan Did Not Drown and that Plaintiffs Know What Happened**

57. On September 23, 2026, Hughes published a post in which he said (Ex. B-21):

> Hughes: Nolan Wells, did NOT have ANY friends – especially them MILDEWED BOLOGNA LOOKING ONES, because if they WERE his friends, they would SAY SOMETHING, because

> I believe that they KNOW something! . . . Nolan did NOT fawking drown!!!

58. On September 24, 2026, Hughes wrote, "Like I said...Nolan Wells did NOT DROWN . . . . So why did the GRAND JURY REPORT suggest that Nolan Wells' death was, an ACCIDENTAL DROWNING??? . . . Nolan Wells did NOT DROWN!!!" On September 27, 2026, he wrote, "How can someone 'dry drown' . . . ??? You people, will make up ANYTHING, to protect racism," and replied to a commenter, "You cannot WASH ASHORE, with NO FAWKING WATER and NO DEBRIS, in your ENTIRE BODY!" Ex. B-22, B-26, B-29.

59. The gist of these statements is that Nolan was killed, that Plaintiffs know how, and that Plaintiffs are concealing it. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. The Grand Jury found that the position, condition, time of discovery, and location of Nolan's body "is consistent with drowning," Ex. A at 6, and that the passengers on the three boats "cooperated fully with this investigation." Ex. A at 5-6.

**6. Hughes Again Calls Plaintiffs Nolan's "Murderers" and Insinuates that They Buried Evidence**

60. On September 26, 2026, Hughes published what he represented to be Plaintiffs' private messages, with these words (Ex. B-25):

> Hughes: Here are more text messages from #NolanWells #alleged white friends who may be his murderers.

61. The same day, Hughes published a second post about a message in which, on the day of Nolan's funeral, friends planning a memorial wrote of bringing "a shovel or 2 so we can dig the cross deep enough it won't fall over," and of Nolan's flip-flops, "We can bury those as well." Hughes asked his audience, "Who had the flip flops after Christine asked for them? Why were they still available to bury two weeks later instead of being handed over? WHAT HAPPENED TO NOLAN WELLS?" Ex. B-24.

62. The gist of these statements is that Plaintiffs murdered Nolan and withheld and buried his belongings to conceal it. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light.

**7. Hughes Publishes an Image of Plaintiffs in Jail Uniforms and Calls for Them to Be Locked Up**

63. On September 24, 2026, Hughes published on the "Boogie THEE LowDown" page a photograph of Plaintiffs with Nolan that had been altered to dress Plaintiffs in orange jail uniforms. Above it he wrote, "Lock all of their pasty asses up, and slang Warren ol' dehydrated and Crypt Keeper lookin' ass in there toooooo lol." Ex. B-23.

64. On or about October 3, 2026, Hughes wrote that "Jax Pitalo, Morgan Seymour, and Warren Hudson, done went on FOX NEWS . . . saying the same ol' shihhh, that NO ONE believes!" On or about October 4, 2026, he told his audience that the network had "removed the scripted interview" because Plaintiffs were "wearing EAR PIECES" and "being coached," and asked, "So now FOX NEWS, is on a damn COVERUP???" Ex. B-27, B-28.

65. The gist of these statements is that Plaintiffs are criminals who belong in jail for Nolan's death and that their public denials are scripted lies. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light.

**F. Hughes Is Told His Statements Are False**

66. Hughes was told at the outset that what he was publishing was false. On July 28, 2026, he published images of a private message that, by his account, Warren's mother had sent him "on 7/5/26 at around 11:30PM." The message as he published it reads in part: "I am here to tell you that we all [love] Nolan and are all deeply distraught. Your information is not correct and I ask you to please stop posting about Warren and our family." Ex. B-7. Hughes did not stop. He published her message, over the legend "FB: Boogie LowDown," to the audience she had asked him to stop addressing.

67. Hughes knew that Plaintiffs disputed his statements and had retained counsel to answer statements like his. On August 1, 2026, he reported that a legal fund had been established for Warren and Jax and wrote, "Now I KNOW YOU FAWKING LYING!" On August 21, 2026, he reported that Plaintiffs had "sent a LETTER OF INTENT TO SUE, to AL SHARPTON, for Defamation." On September 6, 2026,

he published caricatures of Plaintiffs' counsel and wrote, "these are the attorneys, that WE, the PEOPLE, are supposed to be AFRAID OF." Ex. B-8, B-17, B-18.

**G. Hughes's Knowledge and Fault**

68. Hughes published the statements described in Subsections E.4 through E.7 after the Grand Jury's report had been filed, publicly released, and widely reported, and after he had himself published its cover and announced that it would not make him stop. He published the "white murderers" post, and every other statement described in Sections D and E, after Warren's mother had told him that his information was not correct and had asked him to stop.

69. Hughes's own words show his state of mind. He told his audience that the Grand Jury's report would not make him "SHUT TF UP or MOVE ON," and he answered a warning that his page was being watched with, "I DON'T GIVE A DAMN!" He attributed words to the Sea Tow recording that were not spoken. He qualified accusations of murder with "#allegedly" and "in my opinion" while presenting them to his audience as what happened.

70. Hughes knew or should have known in the exercise of due diligence, that his statements, accusations, and insinuations of and concerning Plaintiffs are false. Nevertheless, Hughes intentionally, maliciously, in bad faith, recklessly, and/or negligently published, and continues to publish, those statements, accusations, and insinuations to the viewing public.

**H. The Resulting Harm and the Threat of Further Harm**

71. After Hughes's publications, Plaintiffs and their families received threatening and harassing messages, calls, and comments.

72. As a direct and proximate result of Hughes's conduct, each Plaintiff has suffered injury to his reputation, humiliation, fear for his safety, anxiety, and restriction of his ordinary activities and routines. Each Plaintiff seeks recovery only for his own injury proximately caused by Hughes's actionable conduct, not for injury caused by others in the wider controversy.

73. Hughes's conduct is ongoing. He has continued to publish posts about Plaintiffs into October 2026 and has stated that the Grand Jury's report will not make him stop. Hughes lives in the same

county as Plaintiffs. Unless restrained by this Court, Hughes is likely to continue directing his audience's hostility toward Plaintiffs.

74. The threatened injury is immediate and irreparable. No award of money damages after trial can undo physical harm or restore a young man's safety or his name.

**COUNT I: DEFAMATION PER SE**

75. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count One of this Complaint and make the same a part of this Count.

76. Hughes published of and concerning Warren, Jax, and Morgan the statement that they are "those white murderers." The statement is false. It imputes to each Plaintiff the crime of murder, Miss. Code Ann. § 97-3-19, and is libelous per se. It was published without privilege to third persons in Jackson County, Mississippi and elsewhere, with knowledge of or reckless disregard for its falsity or, at a minimum, negligently.

77. Further and in addition, Hughes has libeled and slandered Plaintiffs through his false and defamatory statements and his unprivileged publication of those statements to viewers in Jackson County, Mississippi and elsewhere. The statements referenced herein, or the substance or gist of same, are of and concerning each Plaintiff and are libelous and slanderous per se because they impute to each Plaintiff criminal responsibility for Nolan's death, tampering with physical evidence, and hindering prosecution, each a felony under Mississippi law. Miss. Code Ann. §§ 97-3-19, 97-9-125, 97-9-105. Others are libelous and slanderous when viewed in their context and in the context of Hughes's wrongful acts. Hughes's acts were malicious, in bad faith, and made with knowledge of or reckless disregard for their falsity or were at least negligent. Hughes is liable for the foreseeable republication of his statements.

78. The publication of these false and defamatory statements has injured and damaged each Plaintiff's reputation; has diminished the esteem, respect, goodwill, and confidence in which each Plaintiff is held; has excited adverse, derogatory, and unpleasant feelings and opinions against each of them; and has caused each of them to suffer humiliation, emotional distress, and other damages.

## COUNT II: TORTIOUS INVASION OF PRIVACY THROUGH PUBLICITY PLACING A PERSON IN A FALSE LIGHT

79. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Two of this Complaint and make the same a part of this Count.

80. Through the unprivileged publication of the statements, images, and videos described herein, Hughes gave publicity to matters concerning Plaintiffs and placed them before the public in a false light, as persons responsible for their friend's death who concealed it and escaped justice, which would be highly offensive to a reasonable person. Hughes had knowledge of, or acted in reckless disregard as to, the falsity of the publicized matters and the false light in which Plaintiffs would be placed, including by publishing after the Grand Jury's findings were made public.

81. As a direct and proximate result, each Plaintiff has suffered mental anguish, emotional distress, humiliation, and fear for his safety. This Count is pleaded in addition to and in the alternative to Count One, and Plaintiffs seek no duplicate recovery.

## COUNT III: CIVIL STALKING

82. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Three of this Complaint and make the same a part of this Count.

83. Mississippi law prohibits any person from purposefully engaging in a course of conduct directed at a specific person, or making a credible threat, when the person knows or should know that the conduct would cause a reasonable person to fear for his safety or the safety of another. Miss. Code Ann. § 97-3-107. That statute was enacted to protect persons in Plaintiffs' position from the type of harm Plaintiffs have suffered.

84. Hughes violated that statute by purposefully engaging in a course of conduct directed at Plaintiffs, consisting of a post calling Plaintiffs "those white murderers" and dozens of other posts published over a period of months branding them as responsible for Nolan's death, continued after he was told that his statements were false and asked to stop and after the Grand Jury's findings were made public, together with his announcement that the Grand Jury's report would not make him stop and his publication of an

image depicting Plaintiffs in jail uniforms, when he knew or should have known that such conduct would cause a reasonable person to fear for his safety.

85. Hughes's violation of that statute establishes the standard of conduct Hughes breached, supports negligence per se, and furnishes grounds for the injunctive relief requested herein. As a direct and proximate result, each Plaintiff has suffered fear for his safety, emotional distress, restriction of his activities, and other damages. This Count is pleaded in the alternative and without duplicate recovery.

**COUNT IV: PRELIMINARY INJUNCTION**

86. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Four of this Complaint and make the same a part of this Count. This Count is asserted under Mississippi Rule of Civil Procedure 65(a).

87. As shown by the specific facts set forth in this Complaint, Plaintiffs will suffer immediate and irreparable injury, loss, or damage unless Hughes is enjoined pending final judgment. Hughes is engaged in an ongoing course of publications branding Plaintiffs as responsible for Nolan's death and continues to publish. Hughes's accounts are the instrument of the harm. Every post and comment renews his accusation before his audience and inflicts injury that no later judgment can undo. Hughes has stated that he will not stop on his own.

88. Upon notice and hearing, Plaintiffs request a preliminary injunction, effective immediately and continuing until final judgment after a trial on the merits, that prohibits and enjoins Hughes, and those persons in active concert or participation with his who receive actual notice of the order, from: (i) creating, posting, publishing, uploading, scheduling, sharing, reposting, stitching, duetting, or otherwise disseminating any content of any kind and on any subject, whether video, audio, photograph, image, text, or otherwise, on TikTok, Instagram, YouTube, Facebook, X, Threads, Snapchat, Twitch, Kick, Rumble, Discord, Reddit, or any other social-media, video-sharing, or livestreaming platform, whether through his own accounts, any new, alternate, anonymous, or pseudonymous account, any account belonging to another person, or any person acting at his direction or on his behalf; (ii) starting, hosting, co-hosting, joining, requesting to join, accepting an invitation to join, appearing in, speaking in, being seen or heard in,

moderating, or otherwise participating in any LIVE, livestream, LIVE battle, multi-guest LIVE, co-host session, audio room, or other real-time broadcast on any such platform, whether on camera, off camera, or by voice only, and whether from his own device or another person's; and (iii) posting, publishing, or sending any comment, reply, direct message, or chat on any such platform, including in the chat or comments of another person's LIVE or post. In the alternative, Plaintiffs request a preliminary injunction that:

(a) prohibits and enjoins Hughes, and those persons in active concert or participation with his who receive actual notice of the order, from publishing, posting, broadcasting, or otherwise disseminating any Plaintiff's home address, school, workplace, telephone number, vehicle description, or other nonpublic identifying or locating information, or that of any member of a Plaintiff's household;

(b) prohibits and enjoins Hughes from encouraging, soliciting, or directing others to locate, contact, visit, follow, threaten, harass, or confront any Plaintiff or any member of a Plaintiff's household;

(c) prohibits and enjoins Hughes from publishing, posting, broadcasting, or otherwise disseminating the name, photograph, video image, voice, or likeness of any Plaintiff, or any username, social-media handle, or other identifier of any Plaintiff, in any content within his control;

(d) prohibits and enjoins Hughes from directly or indirectly contacting, messaging, tagging, or mentioning by username or handle any Plaintiff or any member of a Plaintiff's household, and from recording, broadcasting, or livestreaming within 1,000 feet of any Plaintiff's residence or school;

(e) requires Hughes to remove from any account within his control any content that discloses any Plaintiff's nonpublic identifying or locating information or that displays any Plaintiff's name, photograph, video image, or likeness; and

(f) requires Hughes to preserve, and not delete, destroy, or alter, all content, recordings, messages, and data relating to Plaintiffs, Nolan Wells, or the subject matter of this action, including content removed under subparagraph (e).

89. Nothing less than the complete restraint requested in the first sentence of Paragraph 88 will stop the harm. Hughes has used written posts, replies to his followers' comments, Plaintiffs' photographs, altered images of Plaintiffs, footage of Plaintiffs' own interviews, and what he represents to be Plaintiffs' private messages to brand Plaintiffs as responsible for Nolan's death, and he publishes through more than one account. An order limited to particular content would invite evasion through rephrased statements and new accounts. Should the Court decline to enter that restraint, the alternative restraint set forth in subparagraphs (a) through (f) of Paragraph 88 is narrowly tailored and should issue at a minimum. The alternative restraint does not restrict Hughes's commentary on the investigation of Nolan's death or any other matter of public concern; it reaches only the disclosure of Plaintiffs' nonpublic locating information, the public identification of the minor Plaintiffs by name, image, or likeness, direct contact with Plaintiffs and their households and proximity to their homes and schools, the solicitation of others to locate, contact, or confront Plaintiffs, the removal of content so disclosing or identifying them, and evidence preservation. Plaintiffs request that security under Rule 65(c) be set in a nominal amount.

90. Plaintiffs are entitled to a preliminary injunction because there is a substantial likelihood that they will prevail on the merits; the injunction is necessary to prevent irreparable injury; the threatened injury to Plaintiffs outweighs any harm the injunction might do to Hughes; and entry of the injunction is consistent with the public interest.

**COUNT V: PERMANENT INJUNCTION**

91. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Five of this Complaint and make the same a part of this Count.

92. Upon final adjudication, Plaintiffs request a permanent injunction (a) continuing the relief described in Paragraph 88; (b) requiring Hughes to remove from any account within his control the specific statements finally adjudicated false and defamatory; and (c) prohibiting Hughes from republishing the

specific statements so adjudicated. Damages alone are an inadequate remedy because, absent such relief, Hughes's adjudicated falsehoods will remain online and continue to injure Plaintiffs indefinitely.

93. Any injunctive relief will describe the restrained conduct in reasonable detail and will bind nonparties only as permitted by Mississippi Rule of Civil Procedure 65(d).

**DAMAGES**

94. As a direct and proximate result of the acts and omissions of Hughes described herein and to be proven at trial, each Plaintiff has sustained serious damage to his reputation as well as mental and emotional distress, and each will continue to experience such damage in the future. Accordingly, each Plaintiff is entitled to an award of actual or compensatory damages, including presumed damages as permitted by law, in an amount that will fully and fairly compensate him for the damages and injuries suffered, past, present, and future. Because Hughes's statements falsely impute to each Plaintiff criminal responsibility for Nolan's death, tampering with physical evidence, and hindering prosecution, they are defamatory per se, and injury to each Plaintiff's reputation is presumed as a matter of law without proof of special damages. Hughes made those statements with knowledge of their falsity or with reckless disregard for whether they were false, and each Plaintiff is therefore entitled to presumed damages in addition to any actual damages proven at trial.

95. Additionally, Hughes's willful and grossly negligent conduct complained of herein and to be proven at trial entitles Plaintiffs to an award of punitive damages pursuant to Miss. Code Ann. § 11-1-65. Hughes acted with actual malice and with gross negligence evidencing a willful, wanton, and reckless disregard for the safety of others, including by continuing to publish false criminal accusations after he was told that his statements were false and after the Grand Jury's findings were made public.

96. All monetary and equitable relief sought is subject to the jurisdictional limitation stated in Paragraph 16. The compensatory and punitive damages requested are aggregate amounts for this action, not separate demands for each Plaintiff.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs, Benjamin Warren Hudson, Jr., Eli Jax Pitalo, and Morgan Seymour, each by and through his father and next friend, demand a trial by jury and

judgment against the Defendant, Damarcus Hughes, and pray that process issue to the Defendant as required by law and that the Court grant the following relief:

(a) A Preliminary Injunction as described in Paragraph 88, upon nominal security, and a Permanent Injunction as described in Count Five;

(b) Actual, compensatory, and presumed damages, and punitive damages under Miss. Code Ann. § 11-1-65, in amounts to be determined by the jury, provided that all damages and the value of all equitable relief shall not exceed $200,000.00 in the aggregate, exclusive of costs and interest; and

(c) Costs of court, prejudgment and post-judgment interest as allowed by law, and such other relief as the Court finds just.

**RESPECTFULLY SUBMITTED**, this the 6th day of October 2026.

FOR: BENJAMIN WARREN HUDSON, JR.,
ELI JAX PITALO, and
MORGAN SEYMOUR,
each by and through his father and next friend, **PLAINTIFFS**

BY: ______________________________
HON. J. TYLER COX, ATTORNEY FOR PLAINTIFFS

**PREPARED AND SUBMITTED BY:**

**TAYLOR AND COX LAW FIRM**

HON. J. TYLER COX, 105807
HON. NICHOLAS MOBLEY, 105832
HON. ROSS H. TAYLOR, 107237
POST OFFICE BOX 0006
PASCAGOULA, MS 39568
PHONE: 228-696-0111
EMAIL: tyler@taylorandcox.com

STATE OF MISSISSIPPI
COUNTY OF JACKSON

PERSONALLY CAME AND APPEARED before me, the undersigned authority in and for the jurisdiction aforesaid, BENJAMIN WARREN HUDSON, JR., Plaintiff, and DR. BENJAMIN HUDSON, his father and next friend, who, after first being duly sworn, each state on oath that he has read the foregoing Complaint; that the matters and facts stated therein concerning himself and his own experiences are true and correct of his own personal knowledge; and that all other matters stated therein are true and correct to the best of his knowledge, information, and belief, and as to those matters he believes them to be true.

BENJAMIN WARREN HUDSON, JR.

DR. BENJAMIN HUDSON, Next Friend

SWORN TO AND SUBSCRIBED before me, this the 6 day of October 2026.

NOTARY PUBLIC

My Commission Expires:

STATE OF MISSISSIPPI
CHRISTINE SEAMAN
NOTARY PUBLIC
Jackson County
Commission Expires
July 19, 2027
COMMISSION NUMBER 368644

STATE OF MISSISSIPPI

COUNTY OF JACKSON

PERSONALLY CAME AND APPEARED before me, the undersigned authority in and for the jurisdiction aforesaid, ELI JAX PITALO, Plaintiff, and GEORGE "TRAE" PITALO, III his father and next friend, who, after first being duly sworn, each state on oath that he has read the foregoing Complaint; that the matters and facts stated therein concerning himself and his own experiences are true and correct of his own personal knowledge; and that all other matters stated therein are true and correct to the best of his knowledge, information, and belief, and as to those matters he believes them to be true.

Jax Pitalo
ELI JAX PITALO

George Pitalo III
GEORGE "TRAE" PITALO, III, Next Friend

SWORN TO AND SUBSCRIBED before me, this the 6 day of October 2026.

Christine Seaman
NOTARY PUBLIC

STATE OF MISSISSIPPI
CHRISTINE SEAMAN
NOTARY PUBLIC
Jackson County
Commission Expires
July 19, 2027
COMMISSION NUMBER 368644

My Commission Expires: ____________________

STATE OF MISSISSIPPI

COUNTY OF JACKSON

PERSONALLY CAME AND APPEARED before me, the undersigned authority in and for the jurisdiction aforesaid, MORGAN SEYMOUR, Plaintiff, and MICHAEL SEYMOUR, his father and next friend, who, after first being duly sworn, each state on oath that he has read the foregoing Complaint; that the matters and facts stated therein concerning himself and his own experiences are true and correct of his own personal knowledge; and that all other matters stated therein are true and correct to the best of his knowledge, information, and belief, and as to those matters he believes them to be true.

Morgan Seymour
MORGAN SEYMOUR

M. Seymour
MICHAEL SEYMOUR, Next Friend

SWORN TO AND SUBSCRIBED before me, this the 6 day of October 2026.

Christine Seaman
NOTARY PUBLIC

My Commission Expires:

STATE OF MISSISSIPPI
CHRISTINE SEAMAN
NOTARY PUBLIC
Jackson County
Commission Expires
July 19, 2027
COMMISSION NUMBER 368644

**EXHIBIT A – GRAND JURY REPORT – FILED COVER**

FILED
SEP 18 2026 R
RANDY CARNEY, CLERK
BY________________D.C.




# Jackson County Grand Jury Report September 14-18, 2026

**EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 1**

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI**
**19TH CIRCUIT COURT DISTRICT**

**IN RE: DEATH INVESTIGATION**
**OF NOLAN XAVIER WELLS**

---

**GRAND JURY REPORT**

---

The Jackson County Grand Jury was impaneled on April 20, 2026, reconvened on September 14, 2026, and adjourned on September 18, 2026. The Grand Jury finds that the death of Nolan Xavier Wells on or about July 4, 2026, in Jackson County, Mississippi, being of great public concern, is within the Grand Jury's investigative authority. The Grand Jury engaged in a thorough and complete investigation into the death of Mr. Wells. Our sworn duty is to allow or deny issuance of an indictment. As the foreperson of the Grand Jury, I report that the Grand Jury unanimously returns a No True Bill with respect to the death investigation of Nolan Xavier Wells.

Pursuant to Rule 13.6 of the Mississippi Rules of Criminal Procedure, the Grand Jury is authorized to issue a report of its findings related to the death investigation of Mr. Wells, and said report is being filed with the Circuit Clerk of Jackson County, Mississippi.

Pursuant to Rule 13.5 of the Mississippi Rules of Criminal Procedure, a Grand Juror, except when called as a witness in court, shall keep secret the proceedings and actions taken in reference to matters brought before the Grand Jury for six (6) months after final adjournment of the Grand Jury, and the name and testimony of any witnesses appearing before the Grand Jury shall be kept secret. The date of final adjournment of the Grand Jury is unknown as of the date of this report.

The Grand Jury was impaneled pursuant to Rule 13.1 of the Mississippi Rules of Criminal Procedure, consisting of twenty-five (25) Grand Jurors from a cross section of citizens of Jackson County, Mississippi. Two (2) Grand Jurors requested to be excused from this session for unavoidable and urgent reasons. The twenty-three (23) Grand Jurors that heard this matter ranged in age from twenty-seven (27) to sixty-eight (68) years of age and included thirteen (13) males, ten (10) females, twelve (12) Caucasians, five (5) African Americans, one (1) Asian, two (2) Hispanics, two (2) Native Americans, and one (1) individual who preferred "other."

# EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 2

The Grand Jury was expressly charged by the impaneling Circuit Judge with not only being the means of bringing to trial those people who are accused of a crime, but "also to protect persons from unfounded accusations whether presented by legal officers or by others who may be motivated by public clamor or private malice."

The District Attorney advised the Grand Jury as to all relationships and interactions of any kind amongst the various individuals involved in the case, including witnesses, investigators, or prosecutors. The Grand Jury finds no conflicts of interest in the investigation and presentation of this matter.

The Grand Jury issued one hundred thirty-two (132) subpoenas and heard from forty-three (43) witnesses. Seven (7) individuals were invited to testify before the Grand Jury. [redacted], [redacted], [redacted] and [redacted] accepted the Grand Jury's invitation and testified in this matter. [redacted] was also invited and wished to testify, but was unable due to circumstances outside of [redacted] control. The Grand Jury did consider [redacted] recorded statement to law enforcement in its deliberations. [redacted] did not accept the Grand Jury's invitation to testify. The Grand Jury did consider [redacted] recorded statement to law enforcement in its deliberations.

The Grand Jury, through the District Attorney's Office, made written requests to the family of Mr. Wells and their legal team to produce any evidence collected in their independent investigation into the death of Mr. Wells. [redacted], on behalf of Mr. Wells' family, advised that their investigation revealed no witnesses or evidence "whom the legal team reasonably believes possess information germane to potential criminal activity that warrants referral to your office [the District Attorney's Office]." Further, the family did not request that any "additional document, recording, photograph, digital media, report, or other material in the legal team's possession be submitted to the Grand Jury." The Grand Jury received a fourteen (14) page report concerning Mr. Wells' cellular phone prepared by the families' own forensic examiner, Garrett Discovery Inc., entitled "Mobile Device Examination Findings Preliminary Report" that was provided to the District Attorney on August 28, 2026. After the Grand Jury convened to hear this matter, the Grand Jury received a twenty-one (21) page "mobile device examination findings – device lock state, screen activity, messages, calls, location, and application usage…final report"

and a two-hundred sixty-one (261) page "Snapchat Conversation Report." The Grand Jury considered these reports in its investigation into the death of Mr. Wells. The Grand Jury also received copies of all correspondence between the District Attorney and the legal team for Mr. Wells' family.

The Grand Jury had full and open access to the complete investigative file of the Jackson County Sheriff's Office, which included materials from all law enforcement agencies who assisted in the Death Investigation of Mr. Wells. The Grand Jury considered, *inter alia*, the following:

- Testimony of witnesses;
- Physical evidence collected during the investigation;
- Digital evidence collected during the investigation;
- Reports generated during the investigation;
- Interviews and recorded statements collected during the investigation;
- Images collected during the investigation;
- Videos/recordings collected during the investigation;
- Maps collected/generated during the investigation;
- Global Positioning System (GPS) and location data collected during the investigation;
- Cellular phone extractions collected during the investigation; and
- Responses to subpoenas duces tecum.

In addition to the reports from Mr. Wells' family's legal team from their forensic examination of Mr. Wells' cellular phone, the Grand Jury heard sworn testimony of forensic pathologist Dr. [redacted] Dr. [redacted] was retained by the Wells family to conduct an independent autopsy. The Grand Jury is aware that Dr. [redacted] was provided full and complete access to all investigative materials. Dr. [redacted] also visited Horn Island with law enforcement and District Attorney staff and met with the Chief Medical Examiner for the State of Mississippi, Dr. [redacted] at the Mississippi Forensics Laboratory. Dr. [redacted] was given full access to examine Mr. Wells' internal neck structures retained by the medical examiner and his request for the making of additional slides for histological study was fulfilled. Dr. [redacted] confirmed that the retention of this tissue is appropriate and best practice in forensic pathology. Dr. [redacted] also dispelled rumors about various other organs, including the lungs and stomach, being retained. Dr. [redacted] confirmed that he received all of Mr. Wells' body parts, except for the internal neck structures appropriately retained by the medical examiner. The Grand Jury finds that Mr. Wells did

**EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 4**

not have cocaine in his system at the time of his death and found no evidence to suggest Mr. Wells ever used cocaine. The Grand Jury considered the toxicology report in this matter which supports witness accounts about Mr. Wells from July 4, 2026, but understands the toxicology is not particularly informative as decomposition fluid is an unreliable source for evaluating substance levels within a body.

Both the State of Mississippi Chief Medical Examiner and Dr. [redacted] opined that the cause and manner of Mr. Wells' death is undetermined and that drowning is a diagnosis of exclusion. There was bruising on the back of Mr. Wells' head which was not a fatal injury. Further, the Grand Jury found no evidence of any fatal injury or organic disease to Mr. Wells' body. The State of Mississippi's Chief Medical Examiner and Dr. [redacted] disagree about the presence of bruising (non-deep tissue) on Mr. Wells' buttocks and shoulder. The Grand Jury considered credible evidence concerning the circumstances of how Mr. Wells sustained the injury to the back of his head, but the exact cause of the injury remains uncertain. A witness testified under oath that he saw Mr. Wells slip awkwardly off the side of a boat around the time of 3:30 p.m. on July 4, 2026, but could not say whether Mr. Wells struck his head during the fall. The witness testified that Mr. Wells continued to socialize after the fall and did not appear injured. The Grand Jury understands that neither forensic expert has ruled out accidental drowning as a cause of Mr. Wells' death. While the Grand Jury found no other evidence to explain the bruising on the back of Mr. Wells' head, or the suspected bruising on his buttocks and shoulder, the Grand Jury cannot say with absolute certainty that this fall caused this bruising.

The Grand Jury finds that Mr. Wells accompanied a group of friends to Horn Island on July 4, 2026. This group of friends traveled on three (3) different boats: the Triton, the Palm Beach, and the Tideline. Mr. Wells traveled to Horn Island on the Triton. [redacted], [redacted], and [redacted] traveled to or from Horn Island on the Triton. [redacted], [redacted], and [redacted] rode either to or from Horn Island on the Palm Beach. [redacted], and [redacted] either rode to or from Horn Island on the Tideline.

4

## EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 5

The Grand Jury finds that Mr. Wells chose to remain at Horn Island on the afternoon of July 4, 2026, after the Triton, the Palm Beach, and the Tideline departed the island. Other individuals, including Mr. Wells, remained at the island to socialize. The Grand Jury finds no credible evidence to support the public allegations that any persons who rode to or from Horn Island on July 4, 2026, on the Triton, the Palm Beach, or the Tideline engaged in any criminal conduct related to the death of Mr. Wells. The allegations against the occupants of the Triton, the Palm Beach, and the Tideline are not based in truth, and are solely the result of public clamor and private malice. Further, the public clamor and malicious allegations against the occupants of the Triton, the Palm Beach, and the Tideline have extended to their family members and friends. The Grand Jury finds that the public attacks on the occupants of the Triton, the Palm Beach, and the Tideline, as well as their family and friends, are malicious, false, and have no truth in fact or evidence.

The Grand Jury received the original Sea Tow call made by occupants of the Triton on July 4, 2026. The Grand Jury finds that the various Sea Tow calls and interpretations of the call circulating on the internet and social media are not true and accurate.

The Grand Jury recognizes that it is common for individuals visiting Horn Island to socialize on boats and in the water. The Grand Jury finds that it is not unusual or suspicious for individuals to return from the island on boats they did not travel to the island on; nor is it unusual for individuals to place their phones and personal items on other boats they visit and socialize on. The Grand Jury finds that Mr. Wells' phone was not the only phone to travel back to the mainland without its owner.

The Grand Jury finds that Mr. Wells attended a pool party on July 3, 2026, and a week prior. The Grand Jury finds that the pool party images widely circulating on social media and other internet platforms were not taken the night of July 4, 2026, and have no evidentiary value to the death investigation of Mr. Wells.

The Grand Jury finds that Mr. Wells purchased his alcohol with his fake identification card. The Grand Jury further finds that no individuals over the age of twenty-one (21) provided alcohol to Mr. Wells or his friends on July 4, 2026.

EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 6

The Grand Jury finds that the Triton had a bilge pump and motor malfunction on July 4, 2026, and was actively taking on water and sinking. The Grand Jury finds that the Triton was towed for a short distance by the Tideline allowing the water to drain from the boat interior while a passenger manually held the motor trim button down.

The Grand Jury finds that there was a thorough search of Horn Island on July 5, 2026, in advance of the discovery of Mr. Wells' body. The Grand Jury is confident that had his body been on the island at that time, it would have been discovered during the extensive search.

The Grand Jury recognizes there have been public assertions that Mr. Wells was the only African American individual on Horn Island on July 4, 2026. The Grand Jury finds that Mr. Wells was not the only African American on Horn Island that day. These false assertions have led to misidentification, speculation, and rumors concerning the death of Mr. Wells.

The Grand Jury finds that GPS data and security footage confirm the accounts of the passengers on the Triton, Palm Beach, and Tideline.

The Grand Jury finds that Mr. Wells was not in any physical altercation or argument on July 4, 2026.

The Grand Jury finds that the individuals who traveled to or from Horn Island on the Triton, Palm Beach, and Tideline cooperated fully with this investigation, including offering marine GPS devices, surveillance footage, cell phones, and statements to law enforcement officers and Mr. Wells' family during this investigation.

The Grand Jury finds that the position of, the condition of, time of discovery, and location of Mr. Wells' body is consistent with drowning.

The Grand Jury finds that Mr. Wells chose to remain on Horn Island after the boat he arrived on departed, which is common for visitors to Horn Island on holidays and other crowded days.

The Grand Jury conducted a comprehensive inquiry into the death of Mr. Wells and is confident in the extensive investigation done by both Federal and State law enforcement agencies.

## EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 7

The Grand Jury acknowledges that there is no statute of limitations on homicide cases in the State of Mississippi. If credible evidence comes to light in the future that suggests Mr. Wells' death was non-accidental, this matter should be represented to the Jackson County Grand Jury for further consideration.

The Grand Jury wishes to extend our deepest and heartfelt sympathy to the parents, family members, and friends of Mr. Wells. The evidence received in this matter convinced the Grand Jury of Mr. Wells' outstanding character.

The Grand Jury wishes to thank the Court for the opportunity to serve our community in this important role and encourages citizens to serve when called upon.

---

COUNTY OF MISSISSIPPI

COUNTY OF JACKSON

PERSONALLY, appeared before me, the undersigned authority in and for the jurisdiction aforesaid, [redacted], Grand Jury Foreperson, who after being sworn by me, states on his oath and certifies that, to the best of [redacted] knowledge, the foregoing represents a true and correct report of the Grand Jury impaneled April 20, 2026, Grand Jury, being recalled on September 14, 2026.

[redacted]

Grand Jury Foreperson

Sworn and subscribed before me on this the 18th day of September, 2026.




Randy Carney, Circuit Clerk

By: [redacted]

Deputy Clerk

RANDY CARNEY
CIRCUIT CLERK
JACKSON COUNTY, MS
MY COMMISSION EXPIRES: DEC 31, 2027

**EXHIBIT B – DEFENDANT'S FACEBOOK POSTS**

**EXHIBIT B-1: Post on or about September 6, 2026 ("Boogie LowDown" profile)**



**EXHIBIT B-2: Post on or about September 6, 2026, with comments ("Boogie LowDown" profile)**



**EXHIBIT B-3: Post of July 21, 2026**

**Boogie THEE LowDown** · Follow
July 21 · Ocean Springs, MS ·

Hey Cousins!

The reason I have been staying off of the Boogie LowDown page, is because I did not want to cause any distractions, leading up to the funeral of the distinguished, Nolan Xavier Wells.

Also, it appears that many of my other content creators, independent media friends (shout out to Don Lemon and Nancy Grace), and social media sleuths, are doing a GREAT job, covering this story.

I am not under a damn gag order, flagged, or anything like that, I honestly just became EXHAUSTED, with hearing and seeing them racist yt folk, under all of my damn posts (lol).

Love You Cousins 🙂— at **Horn Island**. **See less**



SPORTS & RECREATION
**Horn Island**
Madelon and 78 other friends have been here

103 16 3

Like Comment Share

**EXHIBIT B-4: Post of July 22, 2026**

**Boogie THEE LowDown** · Follow
July 22 ·

PART 1 - Officer Tatum (allegedly an interview paid for and booked by Chancery Court Judge Ashlee Cole) interviews Warren Hudson, the "best friend" of #NolanWells




7.3K 2.2K 1K

Like Comment Share

**EXHIBIT B-5: Post of July 23, 2026**

**Boogie THEE LowDown** · Follow
July 23 ·

PART 2 - Officer Tatum (allegedly an interview paid for and booked by Chancery Court Judge Ashlee Cole) interviews Warren Hudson, the "best friend" of #NolanWells




12K 4.5K 1.7K

Like Comment Share

**EXHIBIT B-6: Post of July 26, 2026 (part 1 of 3)**

Boogie THEE LowDown · Follow
July 26 ·

Some shiit, AIN'T ADDING UP!

New Audio Reveals: A Teen Called for Help. An Adult Canceled It. Nolan Never Made It Home.

What the New Audio Reveals:

On July 4, around 4 p.m., a teen on the boat called Sea Tow, a private towing company, and said that their boat was sinking. The caller was panicked. The bilge pump was not working. The dispatcher asked: "Is everyone on board and in good health?

The caller said: "Yeah, yeah, everyone is on board."

But here's what the background audio reportedly captures:

"Nono, wake up
"Wyatt, check his chest"
"Is he dead?"
"Nolan, wake up!!!"

If Nolan was not on the boat ,why are people saying his name?

If Nolan was not on the boat, why did the caller say "everyone is on board"

The Grandfather Who Intervened:

The Sea Tow captain told the dispatcher he was already on the phone with Jerry Adkerson, the boat owner, and the grandfather of one of the teens on the trip.

Adkerson told the captain: The teens did not need help. The situation was, "handled".

Sea Tow, did not end up towing the boat.

The question: Why did an adult, who is the boat owner, cancel a rescue that a panicked teenager just called for?

**EXHIBIT B-6: Post of July 26, 2026 (part 2 of 3)**

The Boat's Journey (GPS Data):

| Time | Event |
|---|---|
| 4:31 PM | Boat leaves Horn Island supposedly without Nolan |
| 5:52 PM | Arrives at Fort Bayou |
| 6:06 PM | Leaves Fort Bayou |
| 7:19 PM | Boat is pulled from the water |
| After 7:19 PM | Boat is towed over land to the owner's Biloxi residence |

A sinking boat, does not make a 90-minute detour to Fort Bayou. A sinking boat does not get towed to a private garage -
It gets towed to a repair shop.

WHO WAS PROBABLY ON THE BOAT?

Based on public reporting and social media confirmations:

| Name | Connection |
|---|---|
| Eli Jax Pitalo | Friend on the trip |
| Erick Alcantara | Friend on the trip |
| Wyatt Pyron | Friend on the trip; grandson of Jerry Adkerson; son of Jennifer Pyron |
| Warren Hudson | Friend on the trip; son of Judge Ashlee Cole |
| Morgan Seymour | Friend on the trip |
| Nolan Wells | Victim |

The boat was eventually towed to the Biloxi residence of Jerry Adkerson, the grandfather's home.

Background voices on the call reportedly say "Wyatt, check his chest." This indicates Wyatt Pyron was on the boat when the call was made.

THE QUESTIONS THAT DEMAND ANSWERS:

1. Why did Jerry Adkerson tell the captain that the teens, did not need help?

**EXHIBIT B-6: Post of July 26, 2026 (part 3 of 3)**

2. If Nolan was not on the boat, why did the caller say, "everyone is on board"?

3. If Nolan was not on the boat, why are people heard saying, "Nolan, wake up" and "is he dead", in the background?

4. Why was the boat towed to a private residence, instead of a repair shop?

5. Why did the friends lawyer up, instead of talking to Nolan's parents?

6. Why did Judge Ashlee Cole issue public statements defending her son, before the investigation was complete?

THE BOTTOM LINE

A teenager called for help — his boat was sinking.

An adult, who is the boat owner and the teen's grandfather, told the rescue company that they did not need help.

The same boat, was later towed to a private residence.

The friends lawyered up and went silent.

Nolan's family is still waiting for answers.

You do notneed to be a detective to see that this does not add up. You just need to ask the right question, which is Why did an adult cancel a boat rescue, for a sinking vessel?

CALL TO ACTION

1. Share this post. Keep the conversation going.
2. Demand transparency. Contact the Jackson County Sheriff's Department at 228-769-3065 and Ben Crump's team at 1-800-691-7111.
3. Stay focused on the facts. The evidence is clear.

This post is based on publicly available information. We share this not as proven fact, but as information that demands investigation and corroboration.

#JustuceForNolanWells **See less**

226 144 149

Like Comment Share

**EXHIBIT B-7: Post of July 28, 2026**

**Boogie THEE LowDown** · Follow
July 28 ·

Here is the ORIGINAL timeline, that was put out, before any of the other "best friends", put out anything.

Warren Hudson's mother, Katie Hudson Seymour, reached out to me on 7/5/26 at around 11:30PM, and this is what she had to say about her son, Nolan, and his friend, Wyatt, regarding the incident at Horn Island, involving #NolanWells #JusticeForNolanWells **See less**




60 · 50 comments · 15 shares

Like Comment Share

**EXHIBIT B-8: Post of August 1, 2026**

**Boogie THEE LowDown** · Follow
August 1 ·

Warren Hudson (son of Dr. Benjamin Hudson and stepson of Chancery Clerk Judge, Ashlee Cole) and Jax Pitalo, have launched a Crowd Funding venture on, GiveSendGo, to cover anticilated legal fees, from the #NolanWells case.

The post on their GiveSendGo is called, STAND WITH NOLAN WELLS' TARGETED FRIENDS.

Goal `$100,000 USD

Currently Raised $17,446 USD

Fundraiser created by Dr. Benjamin Hudson.

Fundraiser funds will be received by Taylor and Cox Law Firm, PA

Now I KNOW YOU FAWKING LYING!

Warren Hudson's father, Dr. Benjamin Hudson, is offering a $50,000 reward, for any information that leads to an arrest for the #NolanWells case.

#JusticeForNolanWells **See less**

**South MS teens launch fundraiser to fight lawsuits related to Nolan Wells' death**

By Margaret Baker

Updated August 1, 2026 2:09 PM Gift Article



SALE 99¢ FOR 6 MONTHS SUBSCRIBE

A fundraising campaign was launched on GiveSendGo on Saturday to help cover legal fees for two teens in any pending wrongful death lawsuits filed over the death of Nolan Xavier Wells.

The money is also to cover legal fees in defamation lawsuits for the two teens, Warren Hudson and Jax Pitalo,

SALE 99¢ FOR 6 MONTHS SUBSCRIBE

"This fund is created for the sole purpose of fighting these individuals," Dr. Benjamin Hudson said on behalf of his son Saturday.

incoming wrongful death actions filed by Attorney Ben Crump and his team," Hudson said.

The second goal for the teen in setting up the fundraising account is to "fund a robust legal team to sue for the litany of slander and libels spread by not only (civil rights attorney Ben) Crump but also many social media influencers, news outlets, and local provocateurs."

from expressing opinions into conduct the law may recognize as actionable in any jurisdiction we can find them"

+3

66 67 38

Like Comment Share

**EXHIBIT B-9: Post of August 10, 2026**

**Boogie THEE LowDown** · Follow
August 10 ·

It is Monday, August 10th, and #allegedly , this is what we know:

When they DEPARTED for Horn Island on July 4th, here were some of the people that were on that journey, or seen on Horn Island:

Nolan Wells - (Living Status - ALIVE)
Bart Edmiston - (Living Status - ALIVE)
Ava Dellenger - (Living Status - ALIVE)
Warren Hudson - (Living Status - ALIVE)
Jax Pitalo - (Living Status - ALIVE)
Tracestin Shepard - (Living Status - ALIVE)
Wyatt Pyron - (Living Status - ALIVE)
Morgan Seymour - (Living Status - ALIVE)
Katie McCormack - (Living Status - ALIVE)

When they RETURNED from Horn Island on July 4th, here were some of the people that were on that journey, and not seen, coming from Horn Island:

Nolan Wells - (Living Status - DEAD)
Bart Edmiston - (Living Status - ALIVE)
Ava Dellenger - (Living Status - ALIVE)
Warren Hudson - (Living Status - ALIVE)
Jax Pitalo - (Living Status - ALIVE)
Tracestin Shepard - (Living Status - ALIVE)
Wyatt Pyron - (Living Status - ALIVE)
Morgan Seymour - (Living Status - ALIVE)
Katie McCormack - (Living Status - ALIVE)

WHAT HAPPENED TO NOLAN WELLS???

This is a very legitimate question, and NO ONE, has given a consistent answer, with a consistent timeline.

Why did everyone else RETURN, except HIM???

Why is everyone else ALIVE, except HIM???

#JusticeForNolanWells Boogie LowDown **See less**

399 77 90

Like Comment Share

**EXHIBIT B-10: Post of August 11, 2026**

**Boogie THEE LowDown** is at **Horn Island**. · Follow
August 11 · Ocean Springs, MS ·

Defamation Attorney, Edward Paltzik, hired by Morgan Seymour, Warren Hudson, and Jax Pitalo, had a few things to say about his clients, who he called, his "friends.

Edward said that these boys are the best that OCEAN SPRINGS has, the best that MISSISSIPPI has, and the best that AMERICA has, honey.

Edward states that Attorney Tyler Cox told him, that these boys are just "good Ocean Springs" people.

Chile, listen for yourself (lol).

#JusticeForNolanWells **See less**




87 123 4

Like Comment Share

**EXHIBIT B-11: Post of August 12, 2026**

Boogie THEE LowDown · Follow
August 12 ·

These are the individuals, that were interviewed by Officer Tatum!




13 33 1

Like Comment Share

**EXHIBIT B-12: Post of August 12, 2026**

**Boogie THEE LowDown** · Follow
August 12 ·

Warren Hudson, during an interview with Officer Tafum, says that he hates that the #NolanWells case is being portrayed as "a bunch of white guys who killed a black guy" or "four guys who went to a stranded island, and dumped Nolan at the island and left him there."

Warren also states that he was the FIRST one to call the Coast Guard, when Nolan was no longer around them.

Warren Hudson states that he was the FIRST one to call Christine Wonsley, when Nolan was no longer around them.

Take a listen.

#JusticeForNolanWells **See less**




219 349 39

Like Comment Share

**EXHIBIT B-13: Post of August 12, 2026**

**Boogie THEE LowDown** is at **Horn Island**. · Follow
August 12 · Ocean Springs, MS ·

Everyone, in these images of "best friends", is ALIVE, except ONE!

Can you guess who it is???
#JusticeForNolanWells **See less**



71 81 9

Like Comment Share

**EXHIBIT B-14: Post of August 14, 2026**

**Boogie THEE LowDown** · Follow
August 14 ·

I do NOT believe Nolan stayed on the island, with some "girl".

I believe that story was MADE TF UP, to COVER THEIR TRACKS, and to create an alibi.

The more I listen to the REAL audio, of that SEA TOW CALL, the more I believe that Nolan, was on that.boat, DYING, and eventually, DIED!

What they DID NOT anticipate, in my opinion, is that the Sea Tow call, was being RECORDED, as soon as that call BEGAN, and not when the call, was ANSWERED, by Vicky!

I believe the reason that Nolan's phone and keys, were at Jax Pitalo's house, is because Nolan ON THAT BOAT, WITH HIS PHONE AND KEYS, when he passed away!

I believe his phone and keys were taken OFF the boat and brought INTO that home, while his body REMAINED on that boat, until they could figure out what to do with him, in my opinion.

#Allegedly
#JusticeForNolanWells **See less**

175 53 8

Like Comment Share

**EXHIBIT B-15: Post of August 14, 2026**

**Boogie THEE LowDown** · Follow
August 14 ·

According to Nolan's dad, on July 4th (or 5th-ish), the CAR, the CAR KEYS, and the CELLPHONE, of Nolan Wells, was at JAX PITALO'S HOUSE!!!

After some tension, Jax finally gave Nolan's phone to Elmore, and had to be persuaded to give Nolan's car keys to Elmore.

In addition, Elmore recalls Jax Pitalo, making a statement that said, "Nolan "was" like a brother to me."

What do you mean, "WAS"?

Hell, at this point in the timeline, Nolan was not even deemed MISSING OR DECEASED, at this point.

#JusticeForNolanWells **See less**




42 6 5

Like Comment Share

# EXHIBIT B-16: Post of August 16, 2026

**Boogie THEE LowDown** · Follow
August 16 ·

I am not sure what the origin of this post is, but THIS TRACKS, in my opinion!

This was sent to me, by one of my followers.

I honestly feel like Nolan, GOT ON THAT BOAT!!!

Also, who is CARTER???

#JusticeFofNolanWells **See less**

There's a video of Carter getting ready to climb into someone's boat, but Warren grabs him and takes him off the boat and they go to Wyatt's boat. As everyone walks back to Wyatt's and Bart's boat Nolan is speaking to Katie McCormick at the shoreline. Wyatt is screaming for Nolan to get on the boat. Nolan leaves Katie at the shoreline and gets on the boat. While on the boat a huge confrontation occurs between Warren and Nolan as a witness states. Nolan is heard screaming at Warren to give him back his phone. So Nolan doesn't get off the boat to speak to Katie AGAIN. He remains on the boat. So the last people to Nolan was Warren because he was having a huge confrontation with him. All the other people on Wyatt's boat, including Wyatt was last people to see and be with Nolan.

I wondering if any of the boys recorded the MMA fights. Did Nolan record Carter's fight in which he got his ass kicked and he might have been pissed about Nolan recording the fight. may explain why Warren took Nolan's phone from him and didn't want to give it back. Didn't Nolan's mom say Nolan's Snap account was tampered with and also pics were deleted o his phone. I'm wondering were they pics of Carter's MMA beatdown. I'm just wondering

82 58 14

Like Comment Share

**EXHIBIT B-17: Post of August 21, 2026**

**Boogie THEE LowDown** · Follow
August 21 ·

Warren Hudson, Jax Pitalo, and Morgan, sent a LETTER OF INTENT TO SUE, to AL SHARPTON, for Defamation, related to the #NolanWells Case.

Oh this is about to be GOOD, because Al is about to TEAR THEIR RAGGED ARSES UP! 😄😄😄

Leave CHRISTINE AND ELMORE WONSLEY ALONE, and tell us, WHAT HAPPENED TO NOLAN WELLS!

Let the DEPOSITIONS...BEGIN! 💙
#JusticeForNolanWells #Forever18 **See less**

sunherald.com
Facebook

SunHerald Log In | Subscrib

SALE 99¢ FOR 6 MONTHS SUBSCRIBE

JACKSON COUNTY

## Nolan Wells' friends intend to sue Rev. Al Sharpton for defamation

By **Margaret Baker**
August 21, 2026 1:04 PM Gift Article

SALE 99¢ FOR 6 MONTHS SUBSCRIBE

Listen to this article

Three friends who were with Nolan Xavier Wells before he died on Horn Island plan to sue the Rev. Al Sharpton for defamation.

Their attorneys notified the civil rights activist and Baptist minister in an intent-to-sue letter filed Friday, but gave him time to "retract and delete every

... Hudson, Jax Pitalo and Morgan Seymour — along with high-profile defamation and media law attorney Edward Andrew Paltzik.

In the intent-to-sue letter, the attorneys allege that Sharpton defamed the trio during a July 14 interview with TMZ and in other remarks he made in the aftermath of the 18-year-old student-athlete's death.

The claims included alleged defamatory

sunherald.com
SunHerald Log In | Subs
LE 99¢ FOR 6 MONTHS SUBSCRI

uring the TMZ interview, Sharpton estioned the circumstances rrounding Wells' death and accusec e three friends of potential ongdoing.

Sharpton discussed Wells' cellphone, which was retrieved from the friends after they returned from Horn Island without Wells. He said the phone's photos and text [illegible] had been erased.

"All of his photos, text messages, everything on the phone had been erased," Sharpton said.

He questioned why Wells was missing

+6

88 31 17

Like Comment Share

**EXHIBIT B-18: Post of September 6, 2026, 6:24 PM**

**Boogie THEE LowDown** is at **Horn Island**. · Follow
September 6 at 6:24 PM · Ocean Springs, MS ·

And THESE are the attorneys, that WE, the PEOPLE, are supposed to be AFRAID OF, because they are defending Warren Hudson, Jax Potato, and Morgan Seymour #Allegedly???

Don't nobody give a damn about Attorney MUCINEX MAN and Attorney SMEAGOL (Tyler Cox and Edward Paltzik) 😄😄😄

#JusticeForNolanWells **See less**



138 22 11

Like Comment Share

**EXHIBIT B-19: Post of September 21, 2026, 11:20 PM**

**Boogie THEE LowDown** · Follow
September 21 at 11:20 PM ·

I am so ANGRY and UPSET about what the Grand Jury released about the #NolanWells case, that I can SCREAM!

In addition, Nolan's mother, Christine Wonsley, JUST had a birthday, so I know that this was NOT the news, that she wanted to hear on her birthday!

I will be doing a comprehensive breakdown of the findings of that "Grand Jury", so stay tuned.

Lord Have Mercy. I am sending all of my Love and Light to Christine Wonsley, Elmore Wonsley, and the entire Wells and Wonsley family.

#Allegedly Racism, appears to have WON AGAIN, in the "Good ol' boy State of Mississippi.

Evil and Rich white people, have been getting away with MURDER, for DECADES, in the State of Mississippi - and they all work TOGETHER, to achieve it! **See less**




291 219 30

Like Comment Share

**EXHIBIT B-20: Post of September 22, 2026, 9:02 AM**

**Boogie THEE LowDown** is at **Horn Island**. · Follow
September 22 at 9:02 AM · Ocean Springs, MS

And if YOU THOUGHT, that this Grand Jury report about #NolanWells was going to make me SHUT TF UP or MOVE ON, then you have LOST YOUR DAMN MIND!

HISTORY, in MISSISSIPPI, about WHITE FOLK and the TRUTH, are like OIL AND WATER - They NEVER have mixed, and they never will.

Y'all (and you know who I am talking about) are some evil and hate-filled, Bible-toting, cokang snorting, orgy-having bastards, who LOVE MURDER, and you ALWAYS will be, and we SEE YOU.

#JusticeForNolanWells **See less**




213 35 24

Like Comment Share

**EXHIBIT B-21: Post of September 23, 2026, 3:46 PM**

**Boogie THEE LowDown** · Follow
September 23 at 3:46 PM ·

Nolan Wells, did NOT have ANY friends - especially them MILDEWED BOLOGNA LOOKING ONES, because if they WERE his friends, they would SAY SOMETHING, because I believe that they KNOW something!

This is why my circle, is VERY BLACK, because if ONE moves, then we ALL move!

Nolan did NOT fawking drown!!!

#JusticeForNolanWells See less

**Coretta Scott King** ·
Following
9h ·




287 28 23

Like Comment Share

**EXHIBIT B-22: Post of September 24, 2026, 2:53 PM**

**Boogie THEE LowDown** · Follow
September 24 at 2:53 PM ·

Like I said...Nolan Wells did NOT DROWN and there NO COCAINE in his system!

The Mississippi State Medical Examiner's autopsy report determined that NO WATER WAS FOUND in his LUNGS, or AIRWAYS!

So why did the GRAND JURY REPORT suggest that Nolan Wells' death was, an ACCIDENTAL DROWNING???

The cause and manner of death remains, UNDETERMINED, with documented evidence of head injuries noted in the report.

Nolan Wells did NOT DROWN!!!

#JusticeForNolanWells **See less**

MISSISSIPPI STATE MEDICAL EXAMINER'S OFFICE

CASE NUMBER: ME26-0514 DECEDENT: Nolan Xavier Wells
AGE: 18 YOA SEX: Male
Received from: JACKSON COUNTY
Date of Examination: 07/07/2026

REPORT OF POSTMORTEM EXAMINATION

I. History that the decedent was found face down in the water at Horn Island.

II. Subcutaneous scalp contusions, bilateral superior nuchal line area.

III. No other external or internal injuries.

IV. No internal organ abnormalities contributing to death.

V. Toxicology (chest decomposition fluid):
A. Ethanol 270 mg/dL.
B. Cannabinoids presumptive positive *.
C. Nicotine and cotinine presumptive positive.
D. Caffeine presumptive positive.

* Comment: Confirmatory testing did not reveal cannabinoids in the decomposition fluid.

CAUSE OF DEATH: Undetermined

MANNER OF DEATH: Undetermined

The facts stated herein are correct to the best of my knowledge and belief.

Staci Turner, MD
State Medical Examiner

08/17/2026
Date

215 Allen Stuart Drive
Pearl, MS 39208



206 42 64

Like Comment Share

**EXHIBIT B-23: Post of September 24, 2026, 11:04 PM**

**Boogie THEE LowDown**
September 24 at 11:04 PM

Lock all of their pasty asses up, and slang Warren ol' dehydrated and Crypt Keeper lookin' ass in there toooooo lol



108 15 comments 4 shares

Like Comment Share

**EXHIBIT B-24: Post of September 26, 2026, 3:04 PM**

**Boogie THEE LowDown** · Follow
September 26 at 3:04 PM ·

On July 6 — the same day Nolan's body was recovered on Horn Island — Christine Wonsley texted Warren and asked him to collect any of her son's belongings left at Jack's house.

Two weeks later, on the evening of July 20 (the day of Nolan's funeral), a group chat captured in the Garrett Discovery records shows someone writing:

"We need to bring a shovel or 2 so we can dig the cross deep enough it won't fall over."

Then: "Bring his flip flops."

(Nolan would have known to bring flip-flops the night before he went to Horn Island on July 4.)

Followed immediately by: "We can bury those as well."

Who had the flip flops after Christine asked for them? Why were they still available to bury two weeks later instead of being handed over?

WHAT HAPPENED TO NOLAN WELLS?

#JusticeForNolanWells **See less**




267 · 207 · 90

Like · Comment · Share

**EXHIBIT B-25: Post of September 26, 2026, 5:01 PM**

**Boogie THEE LowDown** is at **Horn Island**. · Follow
September 26 at 5:01 PM · Ocean Springs, MS ·

Here are more text messages from #NolanWells #alleged white friends who may be his murderers.

Text message from one of the white friends:
We need to go to Nolan's funeral and get with ALL of our other BLACK friends, to prove a STATEMENT, for the MEDIA.

White friend responds to the text saying:
It would shut EVERYONE DOWN.

When someone has "white best friends" like THESE, it makes me draw CLOSER, to my BLACK friends! Y'all can have them!

NONE of those skin cancer having blowhards, were Nolan's friends!

#JusticeForNolanWells **See less**



| | | |
|---|---|---|
| | | smd 278 |
| [redacted] | I can't recognize it but we need to get this out there cause it's the whole truth to the story<br>content_type=1 | Viewed:<br>Saved:<br>Invalid: 5<br>cmd: 521<br>smd 278 |
| [redacted] | We need to go to Nolan's funeral and get with all our other black friends to prove a statement for the media<br>content_type=1 | Viewed:<br>Saved:<br>Invalid: 5<br>cmd: 521<br>smd 278 |
| [redacted] | It would shut everyone down<br>content_type=1 | Viewed:<br>Saved:<br>Invalid: 5 |

81 23 26

Like Comment Share

**EXHIBIT B-26: Post of September 27, 2026, 3:32 PM**

**Boogie THEE LowDown** · Follow
AI content · September 27 at 3:32 PM ·

How can someone "dry drown", when a CURRENT, takes you UNDER water??? You people, will make up ANYTHING, to protect racism.

And then you want us to believe, that out of NOWHERE, Nolan just WASHES ASHORE, and was found dead, on an island from "drowning", without ANY water, nor debris, in his ENTIRE BODY???

Man, GTFOH!!! These Mayonnaise Monsters, really think that we are STUPID, including District Attorney SHE-HULK (Angel Myers McIlrath)!

#JusticeForNolanWells **See less**



1.1K    896    124

Like    Comment    Share

**EXHIBIT B-27: Post on or about October 3, 2026**

**Boogie THEE LowDown** is at **Horn Island**. · Follow
2 days ago · Ocean Springs, MS ·

Jax Pitalo, Morgan Seymour, and Warren Hudson, done went on FOX NEWS aka #TheMAGANewsNetwork chile...saying the same ol' shihhh, that NO ONE believes!

#JusticeForNolanWells **See less**



25 16 4

Like Comment Share

**EXHIBIT B-28: Post on or about October 4, 2026**

Boogie THEE LowDown · Follow
a day ago ·

Welp - Fox News has removed the scripted interview with the 3 members of the Horn Island 5, after social media exposed that the "best friends" of Nolan Wells was wearing EAR PIECES, and alleged they were being coached through the soft ball questions they were asked. #smdh

So now FOX NEWS, is on a damn COVERUP???

#Allegedly It sure looks like it.

#JusticeForNolanWells See less

Video unavailable

This video is private

GO TO HOME




553 253 142

Like Comment Share

**EXHIBIT B-29: Comment reply beneath post of September 27, 2026**

**Gary Thomas Jr.** · 1w · by author
You can absolutely wash ashore, I was a deputy coroner in Anderson, SC and actually worked under Chadwick Bozeman's (Black Panther) uncle Charlie Bozeman.

Reply 20

**Boogie THEE LowDown** · 1w · Author
Gary Thomas Jr. I don't give a damn if you worked with SAMUEL.L. JACKSON'S GREAT GRAND DADDY!

You cannot WASH ASHORE, with NO FAWKING WATER and NO DEBRIS, in your ENTIRE BODY!

You are an IDIOT!

Reply Edited 57